**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

MAZUMA HOLDING CORP.,

                   Plaintiff,

          -against-

STEVEN H. BETHKE, HERBERT H. PRATT,
GRAHAM R. WILLIAMS, AND ZICIX
CORPORATION,

                 Defendants.

--------------------------------------------------------X

**MEMORANDUM OF
DECISION AND ORDER**
13-cv-6458 (ADS)(GRB)

**APPEARANCES:**

**Naidich Wurman Birnbaum & Maday**
*Attorneys for the Plaintiff*
80 Cuttermill Road, Suite 410
Great Neck, NY 11021
       By:    Richard S. Naidich, Esq., of Counsel

**Loewinsohn Flegle Deary, L.L.P.**
*Attorneys for the Plaintiff*
12377 Merit Drive, Suite 900
Dallas, TX 75251-2224
       By:    Alan S. Loewinsohn, Esq
                Carole E. Farquhar, Esq.
                Kerry F. Schonwald, Esq., of Counsel

**Nelson S. Ebaugh, P.C.**
*Attorneys for the Defendants Herbert H. Pratt, Graham R. Williams, and Zicix
Corporation*
2777 Allen Parkway, Suite 1000
Houston, TX 77019
       By:    Nelson S. Ebaugh, of Counsel

**Andrew W. Lawrence, Esq.**
*Attorneys for the Defendants Herbert H. Pratt, Graham R. Williams, and Zicix
Corporation*
75 Prospect Street
Huntington, New York 11743

**NO APPEARANCES:**

*Steven H. Bethke*

**SPATT, District Judge.**

On November 21, 2013, the Plaintiff Mazuma Holding Corp (the "Plaintiff" or "Mazuma"), a holding company, commenced this action against Steven H. Bethke, Herbert H. Pratt, Graham R. Williams, and the Zicix Corporation ("Zicix") (collectively the "Defendants") alleging violations of federal securities law and Texas State law.

On December 31, 2013, Williams and Zicix moved for an order staying this action under Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976), or, in the alternative, transferring venue to the Southern District of Texas pursuant to 28 U.S.C. § 1404(a) on the ground, among others, that there is a parallel action pending in Texas State court. On January 21, 2014, Mazuma (1) cross-moved for leave to file its first amended complaint pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 15(a) and (2) cross-moved to strike certain evidence relied upon by Williams and Zicix in support of their motion for a stay.

On February 26, 2014, Pratt joined in the motion for a stay or to transfer venue.

On March 3, 2014, this Court (1) denied the Plaintiff's motion to strike; (2) granted the Plaintiff's motion to file an amended complaint; and (3) denied the

motion for a stay under <u>Colorado River</u> or to transfer venue to the Southern District of Texas.

On March 31, 2014, Pratt, Williams, and Zicix moved pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings dismissing the amended complaint.

For the following reasons, the motion is denied.

## I.   BACKGROUND

Unless stated otherwise, the following facts are drawn from the amended complaint and construed in a light most favorable to the Plaintiff, Mazuma.

A.  <u>The Parties and Other Relevant Individuals</u>

Mazuma is a non-bank holding company that makes investments in other entities.  Mazuma concedes that it is a Texas corporation with its principal place of business in Texas.  However, Mazuma also has an office located in Great Neck, New York.

The Non-party Curt Kramer is Mazuma's sole officer.  The Non-party Carlos Mayo is the sole "finder" for Mazuma, though it is not clear what that role entails.

Zicix, a Nevada corporation, is the successor company of Bederra Corporation, a nano-cap company described in more detail below.

At all relevant times, Williams was the President and Chief Executive Officer ("CEO"), as well as a director, of Bederra and currently serves in the same role for Zicix.  Williams is a Texas resident.

 At all relevant times, Pratt was Bederra's Vice President, as well as a director.  Pratt is a Texas resident.

Bethke was also a director of Bederra and is a Texas resident.

B.  The Underlying Facts

Mazuma invested in Bederra, and was well-known to the Defendants. Mazuma's business strategy at the time of the stock purchases at issue was to invest in publicly-traded, nano-cap companies, such as Bederra, whose securities are traded on the "Pink Sheets."  Nano-cap companies are often capital-constrained, as their low market capitalization hinders their access to banks or investment firms. Mazuma provided capital to these companies as an investment in return for shares purchased at a discount from the market price.

In 2008, Mazuma invested more than $140,000 in Bederra by purchasing directly from Bederra blocks of shares at a discount.  Williams instructed Mazuma to coordinate the purchases with Bethke, which Mazuma did.  On each occasion, Williams directed, First National Trust Company, Inc. ("First National Trust"), Bederra's transfer agent, in writing, to issue stock certificates to Mazuma pursuant to the terms of the investment.  Those stock certificates contained the signature of Williams, then the Secretary of Bederra.

Beginning in early 2009, Mazuma again purchased blocks of Bederra shares, this time directly from Bethke.  Mazuma purchased a total of approximately 1.139 billion shares of Bederra stock from Bethke between January 2009 and May 2010 (the "Mazuma Shares").  Bethke represented that the shares were duly issued, unrestricted, and freely tradeable.  In advance of each transaction, Mazuma received several documents signed by Williams certifying that Bethke held good title to the shares and that Williams and the company had authorized the pending share sales to

4

Mazuma.  On each occasion, Mazuma received supposedly authentic Bederra stock certificates containing the signatures of Williams and Pratt.

However, Mazuma contends that, to conceal Bethke's stock sales and to lure Mazuma into believing that they were legitimate, the Defendants made several material misrepresentations related to the authenticity of the shares and the authority of Bethke.  The Defendants allegedly manufactured business records and signed stock certificates to make it appear as if the Mazuma shares were not restricted, authorized, and freely tradeable.

During the relevant period, the volume of trading in Bederra stock exceeded the number of free-trading shares issued and outstanding (the "float") due to the introduction of the Mazuma Shares into the market.

Mazuma also alleges that, during the relevant time period, Bederra had no financial reporting requirements, but nonetheless filed periodic reports and disclosures on an electronic quotation system.  Bederra allegedly made at least 22 filings on the Pink Sheets between May 28, 2008 and December 22, 2009, and issued more than 60 press releases between March 2008 and January 2011.  According to Mazuma, Bederra routinely represented in its filings with the Pink Sheets the numbers of shares authorized and outstanding, as well as the public float.  Mazuma contends that Bederra's numerous public disclosures and press releases demonstrate that Williams and Pratt were monitoring and publicly disclosing the float of Bederra securities and the numbers of authorized and restricted shares.

Mazuma alleges that Zicix, Williams, and Pratt knew or were reckless in not knowing that Bethke was issuing shares to Mazuma.  Had Williams and Pratt

monitored the volume of trading in Bederra stock, they would have seen that the volume in Bederra stock often exceeded the "represented" float. For example, on two-trading days – January 12 and January 13, 2010 – the volume of trading in Bederra stock allegedly exceeded the float as reported two weeks earlier by more than 1,000,000 shares. Further, on January 29, 2010, Bederra reported that the float of Bederra stock was 404,827,453, even though the volume of trading in a single trading day on January 26, 2010 – three days earlier – exceeded that amount.

Mazuma further asserts that, in an effort to cover up the presence of the fraudulent shares, Pratt and/or Williams caused Bederra to continually increase the number of authorized shares – eventually increasing the number of authorized shares on the market by more than 1500 percent in an apparent effort to conceal the Defendants' fraud. Pratt and/or Williams also allegedly caused Zicix to ratify the issuance of the Mazuma Shares on October 29, 2010 as part of a cover-up of the Defendants' role in the Mazuma Share issuances.

C.  Texas State Court action

In what Mazuma characterizes as an attempt to deflect increasing regulatory pressure, on August 31, 2012, Zicix filed a civil action in the State of Texas against Mazuma and several other defendants, alleging that the Mazuma Shares were not authorized by Bederra (the "State Lawsuit").

In the State Lawsuit, three defendants, including Kramer and Mayo, unsuccessfully challenged the trial court's personal jurisdiction. Kramer and Mayo are currently taking interlocutory appeals of the denials of their motions to dismiss for lack of personal jurisdiction. Mazuma asserts that the defendants in the State

Lawsuit that are challenging the personal jurisdiction of the Texas trial court have not engaged in any "merits-based" discovery and that there has been no depositions of any party or non-party witness.

In June 2013, the state trial court entered an interlocutory judgment against Bethke and two companies controlled by him.

At some point, Mazuma moved to dismiss the State Lawsuit for *forum non conveniens* and/or to have that action refiled in New York.

On August 26, 2013, the Texas trial court denied Mazuma's motion.

On January 9, 2014, Mazuma and others filed a joint motion for continuance of the State Lawsuit. Bederra, the plaintiff in the State Lawsuit, agreed that the State Lawsuit should be continued and its counsel has requested a Fall 2014 trial date while the defendants in the State Lawsuit have proposed any date after January 19, 2015 due to conflicts with other cases.

D. The SEC Proceeding

On November 25, 2013, the SEC instituted cease-and-desist proceedings pursuant to Section 8A of the Securities Act of 1033 (the "Securities Act") against Mazuma and related parties. Of relevance here, the SEC and Mazuma reached a settlement, the terms of which contained certain findings of fact as follows:

> 10. From about April 2009 through about June 2010, Mazuma Holding Corporation ("Mazuma Holding") and Kramer acquired over 1 billion shares of Bederra Corporation ("Bederra") in 21 separate transactions from the principal of Bederra's transfer agent, who had misappropriated the Bederra share certificates.
>
> 11. Mazuma Holding and Kramer purchased the Bederra shares at a significant discount from the then-prevailing market prices. The discount made it highly likely that Mazuma Holding and Kramer

could immediately re-sell the Bederra shares to the public for a short-term profit.

12. Mazuma Holding and Kramer resold the shares to the public for a profit of $934,404.

13. No registration statement was filed as to any of the Bederra shares offered and sold to Kramer and Mazuma Holding, and which Mazuma Holding and Kramer subsequently resold into the market, and no exemption from registration was applicable to these transactions.

14. [Mazuma and related parties] used the mails and other means of interstate commerce in connection with these offers and sales of the Bederra shares.

15. As a result of the conduct described above, Kramer, Mazuma Corporation, Mazuma Holding Corporation and Mazuma Funding Corporation violated Sections 5(a) and 5(c) of the Securities Act [of 1933], which prohibit the direct or indirect sale or offer for sale of securities through the mails or interstate commerce unless a registration statement has been filed or is in effect.

(Ebaugh Decl., Ex. B, ¶¶ 10-15.).

E.  The Present Action

Meanwhile, on November 21, 2013, Mazuma brought the instant action alleging violations of federal securities law and Texas State law.  In particular, Mazuma alleges violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

The Court notes that Zicix (previously Bederra), Bethke, and Mazuma are parties in both this action and in the State Lawsuit, while Williams and Pratt are not parties in the State Lawsuit.  Bethke has not answered or appeared in this action.

On December 31, 2013, Williams and Zicix moved to stay this action under the Colorado River doctrine, or, in the alternative, transfer venue to the Southern District of Texas pursuant to 28 U.S.C. § 1404(a).   In support of the motion to stay, Williams and Zicix submitted a declaration of its counsel, Nelson S. Ebaugh, which makes reference to the Cease-and-Desist Order.

On January 21, 2014, Mazuma cross-moved under Fed. R. Civ. P. 15(a) for leave to file an amended complaint, seeking to withdraw its state causes of action.

Also, on January 21, 2014, Mazuma moved to strike, among other things, (1) portions of the declarations submitted by Williams and Pratt in support of the motion to stay and (2) the Cease-and-Desist Order as inadmissible under Federal Rule of Evidence ("Fed. R. Evid.") 408.

On February 26, 2014, Pratt joined in the motion for a stay or to transfer venue.

As noted above, on March 3, 2014, this Court (1) denied the motion to strike; (2) granted the motion to file an amended complaint; and (3) denied the motion for a stay of this action under Colorado River or to transfer venue to the Southern District of Texas.

On March 31, 2014, Pratt, Williams, and Zicix (the "Answering Defendants") moved pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings dismissing the amended complaint.

## II.    DISCUSSION

A.  The Legal Standard for a Motion for Judgment on the Pleadings

Fed. R. Civ. P. 12(c) ("Rule 12(c)") provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings."  Under Rule 12(c), "a party is entitled to judgment on the pleadings only if it has established that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law." Bailey v. Pataki, No. 08 Civ. 8563 (JSR), 2010 WL 234995, at *1 (S.D.N.Y. Jan. 19, 2010) (quotation marks and citations omitted) (alteration in original).  "The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to [Rule] 12(c) motions for judgment on the pleadings." Bank of New York v. First Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010).

Thus, the Court applies the Rule 12(b) "plausibility standard," which is guided by "[t]wo working principles." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).  District courts should first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679.  Because "hasty or imprudent use of this summary procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense," district courts should not "grant a motion under Rule 12(c) unless the movant clearly establishes that no material issue of fact remains to be resolved and

that he is entitled to judgment as a matter of law." 5C Charles Alan Wright &

Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1368 (3d ed.).

In deciding a Rule 12(c) motion, the district court may only consider the

facts as presented within the four corners of the complaint. Sira v. Morton, 380 F.3d

57, 66–67 (2d Cir. 2004). "A complaint is deemed to include any written

instrument attached to it as an exhibit, materials incorporated in it by reference, . . .

documents that, although not incorporated by reference, are "integral" to the

complaint," id. (citations omitted), and any facts of which judicial notice may be

taken, Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). The

Second Circuit has emphasized that "a plaintiff's *reliance* on the terms and effect of

a document in drafting the complaint is a necessary prerequisite to the court's

consideration of the document on a dismissal motion; mere notice or possession is

not enough." Id. However, documents that are "neither expressly cited in the

complaint nor integral to the claims raised" may not be considered, even if the

complaint makes "limited quotation[s] from or reference[s] to" those documents.

Sira, 380 F.3d at 67 (citing Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989)

(rejecting the argument that short quotations from an annual report and 10K

statement incorporated those documents in the complaint). If the motion includes

material outside the pleadings and that material is not excluded by the court, the

district court must convert the motion to one for summary judgment. See Sira, 380

F.3d at 66.

As an initial matter, Mazuma asserts that the Court cannot consider two SEC

orders referenced in the motion for judgment on the pleadings without converting

the motion to one for summary judgment, and permitting Mazuma an opportunity to presents its own exhibits. The Court disagrees. Because the SEC orders are part of administrative hearings, the Court may take judicial notice of them without having to convert the motion for judgment on the pleadings into one for summary judgment. Kouakou v. Fideliscare New York, 920 F. Supp. 2d 391, 394 n. 1 (S.D.N.Y. 2012).

B.  The Legal Standard Under Section 10(b) and Rule10b-5

To state a claim under Section 10(b) or Rule 10b–5, a plaintiff must plead the following six elements: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . .; (5) economic loss; and (6) loss causation[.]" Kleinman v. Elan Corp., plc, 706 F.3d 145, 152 (2d Cir. 2013) (alterations in original) (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)).

"It is well settled that causation under federal securities laws is a two-pronged inquiry: transaction causation and loss causation." In re Sterling Foster & Co., Inc. Sec. Litig., 222 F. Supp. 2d 289, 305 (E.D.N.Y. 2002). Transaction causation is a term that is used interchangeably with the word reliance. Burke v. Jacoby, 981 F.2d 1372, 1378 (2d Cir. 1992) (stating that the reliance element of a Section 10(b) claim is referred to as "transaction causation"). On the other hand, "[l]oss causation is causation in the traditional 'proximate cause' sense – the allegedly unlawful conduct caused the economic harm." AUSA Life Ins. Co. v. Ernst and Young, 206 F.3d at 209, 211-12 (2d Cir 2000). Thus, to satisfy both

causation prongs, the plaintiff must demonstrate that the fraud caused him "to engage in the transaction and that it caused the harm actually suffered." Suez Equity Investors, L.P. v. Toronoto-Dominion Bank, 250 F.3d 87, 96 (2d Cir. 2001). Indeed, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4s requires the plaintiff to demonstrate that the act complained of "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4).

The Answering Defendants do not argue that the Plaintiffs have failed to plead a material misrepresentation or omission and scienter in connection with the purchase or sale of a security. Rather, the Answering Defendants principally assert that Mazuma has failed to plead reliance; loss causation; and economic loss. The Court addresses these three elements in turn.

### 1. Transaction Causation or Reliance

In order to sufficiently allege transaction causation or reliance, the plaintiff must set forth that the violations under consideration caused him to engage in the transaction. Litton Indus., Inc. v. Lehman Brothers Kuhn Loeb Inc., 967 F.2d 742, 747 (2d Cir. 1992). To satisfy this element, a plaintiff must show "that but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 186 (2d Cir.2001).

Not all reliance is sufficient to demonstrate liability under the Exchange Act. Instead, the reliance must be "reasonable" or "justifiable." In re Adelphia Commc'ns Corp. Sec. & Derivative Litig., 542 F. Supp. 2d 266, 267 (S.D.N.Y.

2008). The Second Circuit has succinctly explained the standard that courts must apply:

> A showing of reliance may be defeated, however, where defendant establishes that plaintiff should have discovered the true facts. This has been called the due diligence test, to which, traditionally, a negligence standard has applied. . . . [T]he degree of diligence to which plaintiffs are held has been diminished to minimal diligence. More specifically, a plaintiff bears only the burden of negating its own recklessness, once the issue of diligence is raised by defendant.

Royal Am. Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011, 1016 (2d Cir. 1989) (internal citations and quotation marks omitted); see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003) ("In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them.").

The Second Circuit has stated that although district courts need not "recite its factor-by-factor balancing of the relevant considerations," many courts have been guided by the following factors:

> (1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

Brown v. E.F. Hutton Grp., Inc., 991 F.2d 1020, 1032 (2d Cir. 1993).

Here, the Court concludes that the Plaintiff has sufficiently alleged that it relied on the Defendants' alleged misrepresentations and omissions. The

Answering Defendants do not dispute that a reasonable investor would find these representations important in making an investment decision. Affiliated Ute v. U.S., 406 U.S. 128 at 153–54, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972). Instead, the Answering Defendants argue that Mazuma is a sophisticated market participant and, as such, had a duty to make a searching inquiry to avoid participation in an unregistered securities offering. However, it is not clear that the cases relied upon the Answering Defendants support this proposition.

For example, in S.E.C. v. Elliot, 09 CIV. 7594 (KBF), 2012 WL 2161647, at *7 (S.D.N.Y. June 12, 2012), the court cited SEC Release No. 6721, which contains guidance regarding the expected standards of conduct for registered broker-dealers when dealing in unregistered securities. The SEC Release No. 6721 provides:

> The amount of inquiry called for necessarily varies with the circumstances of particular cases. A dealer who is offered a modest amount of a widely traded security by a responsible customer, whose lack of relationship to the issuer is well known to him, may ordinarily proceed with considerable confidence. On the other hand, when a dealer is offered a substantial block of a little-known security, either by persons who appear reluctant to disclose exactly where the securities came from, or where the surrounding circumstances raise a question as to whether or not the ostensible seller may be merely intermediaries for controlling persons or statutory underwriters, then searching inquiry is called for. The problem becomes particularly acute where substantial amounts of a previously little known security appear in the trading markets within a fairly short period of time and without the benefit of registration under the Securities Act of 1933. . . .

Fairly read, SEC Release No. 6721 imposes a duty to inquire on registered broker-dealers, only. In this case, even if Mazuma is considered a sophisticated investor, there is nothing on the face of the amended complaint, or any other

document properly considered on a motion to dismiss, to suggest that Mazuma is a registered broker-dealer.

Further, in Elliot, after a motion for summary judgment was denied, the court held an evidentiary hearing on the issue of the defendants' scienter, after which the court made the following fact finding: "Industry custom and practice is for *investment managers* to determine the provenance of any shares. A prudent *investment manager* will not and should not rely on the self-serving statements of issuers or their counsel." 2012 WL 2161647, at *7 (emphasis added). Here, there is no allegation that Mazuma was an investment manager, and, therefore, at this stage of the litigation, the Court finds that the prudent investment manager standard is inapplicable.

Further, contrary to the Answering Defendants' contention, the SEC did not find that Mazuma breached any duty to investigate. As this Court previously ruled, "[t]he SEC simply found that Mazuma violated the Exchange Act, but did not foreclose liability in federal court as to Zicix and Williams." Mazuma Holding Corp. v. Bethke, 13-CV-6458 (ADS)(GRB), 2014 WL 814960, at *11 (E.D.N.Y. Mar. 3, 2014).

Even if Mazuma were held to a heightened prudent investor standard, "whether [a] plaintiff was placed on guard in a way that was sufficient to trigger a duty to investigate is generally a question of fact that is not to be decided on a motion to dismiss (citation omitted)." Barron Partners, LP v. Lab 123, Inc., No. 07 Civ. 11135 (JSR), 2008 WL 2902187, at *5 n. 3 (S.D.N.Y. July 25, 2008). Indeed, "'[t]he question of whether a party's reliance was reasonable is "always nettlesome

because it is so fact-intensive,' and 'ordinarily a question of fact to be determined at trial.' Where 'the reasonableness of reliance depends upon factual determinations that are not plain from a review of the complaint and its attachments or that remain in dispute after discovery, the fraud claim should not be summarily dismissed on that ground.'" In re Eugenia VI Venture Holdings, Ltd. Litig., 649 F. Supp. 2d 105, 119 (S.D.N.Y. 2008)(internal citation omitted), aff'd sub nom. Eugenia VI Venture Holdings, Ltd. v. Glaser, 370 F. App'x 197 (2d Cir. 2010); see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189,197 (2d Cir. 2003) ("[I]f the loss was caused by an intervening event, . . . the chain of causation will not have been established. But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.").

To be sure, "[a] heightened degree of diligence is [] required where circumstances were such that [the] plaintiff had hints of falsity." In Re Eugenia, 649 F. Supp. at 118; see Keywell Corp. v. Weinstein, 33 F.3d 159, 164 (2d Cir. 1994) ("When a party is aware of circumstances that indicate certain representations may be false, that party cannot reasonably rely on those representations, but must make additional inquiry to determine their accuracy."). In other words, a plaintiff "cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable reliance without making inquiry and investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or truth about an investment." Crigger v. Fahnestock & Co., Inc., 443 F.3d 230, 234 (2d Cir. 2006).

Here, there is no allegation that Mazuma knew or should have known that something was amiss. To the contrary, Mazuma alleges that it received

certifications from Bethke that the Mazuma shares were authentic, authorized, and freely tradeable. Accordingly, the Court finds that Mazuma has properly alleged reliance or transaction causation.

2. Loss Causation

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005). Proving loss causation is prescribed by statute for actions under Section 10(b) and Rule 10b–5. 15 U.S.C. § 78u–4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."). Although it is well-settled that the heightened pleading standards of Rule 9(b) and the PSLRA apply to allegations regarding the misstatements underlying the fraud, the Second Circuit has not yet determined whether these standards apply to allegations of loss causation. Acticon AG v. China N. East PetroleumHoldings Ltd., 692 F.3d 34, 38 (2d Cir. 2012). A short, plain statement that provides defendants with notice of the loss and some notion of the causal connection to the alleged misconduct is sufficient. Dura, 544 U.S. at 346-47.

Generally, in fraud-on-the-market cases, an "inflated purchase price will not itself constitute or proximately cause the relevant economic loss." Dura, 544 U.S. at 342. Indeed, "[u]nless plaintiffs can allege that their losses were attributable to some form of revelation to the market of wrongfully concealed information, they are not recoverable in a private securities action. Such actions are available, after

all, 'not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.'" In re Ramp Corp. Sec. Litig., 05 CIV. 6521 (DLC), 2006 WL 2037913, at *9 (S.D.N.Y. July 21, 2006), quoting Dura, 544 U.S. at 345.

However, unlike in Dura, here, the Plaintiff is not alleging "price inflation" in the traditional sense nor is this a fraud-on-the market case. Rather, the allegations center on Mazuma's purchase of Bederra stock that was represented by the Defendants to be authentic, authorized, and freely tradeable. Further, the alleged fraud was perpetrated against a particular purchaser, Mazuma, rather than the entire market of stock purchasers.

The Answering Defendants characterize the Plaintiff as an "in and out" trader who profited in the amount of $934,404 during the period of time between when Mazuma purchased the stock and when it resold the stock. However, the Court finds that the Answering Defendants circumscribe the relevant time period too narrowly in that they ignore the alleged losses incurred by Mazuma in connection with the SEC investigation – namely, the disgorgement of its profit in the amount of $934,405, interest paid to the SEC in the amount of $109,865, civil penalties of $130,000, and legal fees in the amount of approximately $800,000. Further, contrary to the contention of the Answering Defendants, Mazuma is not relying on the doctrine of collateral estoppel based on the SEC orders to establish its losses.

The question then becomes whether the Plaintiff has set forth sufficient factual allegations that these losses were proximately caused by the Defendants'

alleged misrepresentations or omissions. The Court answers this question in the affirmative.

Neither party cites to case law addressing the circumstances here – that is, a stock purchaser alleging loss causation on the basis of the unauthorized sale of shares of stock, the reselling of which triggered an SEC investigation and penalties. Absent case law on point, the Court considers the viability of this type of loss causation in light of the familiar tort principles of proximate causation.

Indeed, "[o]wing to the great similarity of an action under Rule 10b–5 to an action for common law fraud, courts have consistently characterized loss causation as similar to the tort concept of proximate causation." In re Vivendi Universal, S.A. Sec. Litig., 634 F. Supp. 2d 352, 360 (S.D.N.Y. 2009); see Lentell, 396 F.3d at 172 ("We have described loss causation in terms of the tort-law concept of proximate cause . . . ."); Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 157 (2d Cir. 2007) (same); Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 187 (2d Cir. 2001) (same). As when assessing proximate cause, courts assessing a plaintiff's case for loss causation look to whether the alleged damages were reasonably foreseeable given the alleged false or misleading statements. See Castellano, 257 F.3d at 187 (looking to whether "the damages suffered by plaintiff [were] a foreseeable consequence of any misrepresentation or material omission"). As with proximate cause, these determinations "may often rest in part on legal policy considerations" that "fix a . . . limit on a person's responsibility, even for wrongful acts." Id.

Here, drawing all reasonable inferences in favor of the Plaintiff, the Court concludes that the Plaintiff has alleged loss causation – that is, the Defendants' alleged misrepresentations and omissions proximately caused the Plaintiff's losses. The Court finds that the Plaintiff has alleged facts to suggest that the losses incurred by the Plaintiff, including the civil penalties assessed by the SEC for the resale of the Mazuma shares, were a reasonably foreseeable result of the Defendants' omission of the true nature of the stock certificates at issue and their affirmative representations that the certificates were authentic, authorized, and freely tradable. In other words, the amended complaint "allege[s] facts that support an inference that [defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." Lentell, 396 F.3d at 173.

Accordingly, the Court denies the Answering Defendants' motion for judgment on the pleadings on the basis that the Plaintiff fails to allege loss causation.

3. Economic Loss

Securities fraud damages are "ordinarily . . . based on out-of-pocket losses[.]" In re Crazy Eddie Sec. Litig., 948 F. Supp. 1154, 1165 (E.D.N.Y. 1996)(citations omitted); see also Acticon AG v. China N.E. Petroleum Holdings Ltd., 692 F.3d 34, 38 (2d Cir. 2012) ("Traditionally, economic loss in Section 10(b) cases has been determined by use of the 'out-of-pocket' measure for damages.") (citations omitted).  The out-of-pocket measure entitles a defrauded buyer of securities "'to recover only the excess of what he paid over the value of what he

got.'" <u>Acticon AG</u>, 692 F.3d at 38 (citation omitted). Put another way, such damages measure "the price paid for the security less the security's value on the date of the transaction and absent any fraud[.]" <u>In re UBS Auction Rate Sec. Litig.</u>, 08-cv-2967 (LMM), 2009 WL 860812, at *4 (S.D.N.Y. 2009). The purpose of the out-of-pocket measure of relief is "to restore the plaintiff to the position he was in before the fraud." <u>Id.</u> (citation omitted). "Out-of-pocket losses is also the rule for damages caused by common law fraud." <u>In re Crazy Eddie Sec. Litig.</u>, 948 F. Supp. at 1165 (citing <u>First Nationwide Bank v. Gelt Funding Corp.</u>, 27 F.3d 763, 768 (2d Cir. 1994)).

"However, out-of-pocket damages are not the only permissible measure of recovery." <u>CAMOFI Master LDC v. Riptide Worldwide, Inc.</u>, 10 CIV. 4020 (CM) (JLC), 2012 WL 6766767, at *14 (S.D.N.Y. Dec. 17, 2012). In order to accommodate "the wide variety of factual predicates to § 10(b) claims, courts have utilized their discretion to endorse several different compensatory damages theories," including gross economic loss and benefit of the bargain damages. <u>Panos v. Island Gem Enterprises, Ltd., N.V.</u>, 880 F. Supp. 169, 176 (S.D.N.Y. 1995)(citing <u>Affiliated Ute Citizens of Utah v. United States</u>, 406 U.S. 128, 154-55, 92 S. Ct. 145, 631 L. Ed. 2d 741 (1972) (disgorgement); <u>Levine v. Seilon, Inc.</u>, 439 F.2d 328, 334 (2d Cir. 1971) (out-of-pocket damages); <u>Osofsky v. Zipf</u>, 645 F.2d 107, 114 (2d Cir. 1981) (benefit-of-the-bargain damages); <u>Esplin v.. Hirschi</u>, 402 F.2d 94, 105 (10th Cir. 1968) (consequential damages); <u>Rolf v. Blyth, Eastman Dillon & Co., Inc.</u>, 570 F.2d 38, 49 & n. 21 (2d Cir. 1978) (gross economic loss or rescissionary damages)).

"Consequential damages may include out-of-pocket expenses stemming from related litigation." The Ltd., Inc. v. McCrory Corp., 683 F. Supp. 387, 393 (S.D.N.Y. 1988).  Gross economic loss or "rescissionary" damages "are based on the difference between the price paid [for the security] and the price received on resale, rather than on the excess of the purchase price over the actual value of the stock." Barrows v. Forest Labs., Inc., 742 F.2d 54, 57 n. 7 (2d Cir. 1984) (citing Clark v. John Lamula Investors, Inc., 583 F.2d 594, 603-04 (2d Cir. 1978)).  Benefit-of-the-bargain damages measure the "difference between the value of what was bargained for and the value at the time [of the transaction] of what was received." Barrows, 742 F.2d at 57.

"The choice of any one theory [of damages] over another . . . depends on how the court characterizes the transaction and the fraud." Panos, 880 F. Supp. at 176.  However, "appropriate grounds for damages in § 10(b) actions are not limitless, and courts have required plaintiffs to choose between rescinding a transaction and being paid restitution on the one hand and holding the defrauder to the bargain and recovering out-of-pocket losses resulting from the fraudulent transaction on the other hand." Id. at *4 (citing Randall v. Loftsgaarden, 478 U.S. 647, 662, 106 S. Ct. 1343 (1986)).

In particular, Section 28(a) of the Exchange Act limits recovery for violations of the Exchange Act to "actual damages." 15 U.S.C. § 78bb(a)(1).  This "limitation serves to bar speculative recoveries, but otherwise contemplates that district courts will use discretion to fashion a measure of damages appropriate for

the circumstances." <u>In re UBS Auction Rate Sec. Litig.</u>, 2009 WL 860812, at *3 (citation omitted).

With these principles in mind, the Court finds that, whether viewed as consequential damages or out-of-pocket expenses, the Plaintiff has alleged economic losses in the form of its interest, penalties, and legal fees incurred in connection with the SEC investigation. However, the Court finds that, as a matter of law, Mazuma cannot recover the disgorged profit resulting from its resale of the Mazuma Shares because Mazuma cannot be put in a better position than it would have been without the fraud.

The Answering Defendants also contend that the amended complaint fails to allege which portions of the loss were caused by which Defendants. However, "[a]t the motion to dismiss stage, [Mazuma] need not demonstrate that Defendants' alleged misrepresentations caused all or even most of their losses. Rather, [it] need allege only 'facts that would allow a factfinder to ascribe some rough proportion of the *whole loss* to [the defendant's alleged] misstatements.'" <u>Terra Sec. Asa Konkursbo v. Citigroup, Inc.</u>, 740 F. Supp. 2d 441, 455 (S.D.N.Y. 2010)(citation omitted and emphasis added), <u>aff'd</u>, 450 Fed. Appx. 32 (2d Cir. 2011).

Viewed in this light, the amended complaint adduces sufficient factual allegations to suggest that the Defendants are in fact liable for the total sum of Mazuma's economic losses. Accordingly, the Court denies the Answering Defendants' motion for judgment on the pleadings on the basis that Mazuma has failed to adequately allege economic losses.

## III. CONCLUSIONS

In sum, the Court finds that Mazuma has adequately plead a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).  However, with respect to Mazuma's economic losses, the Court finds that, as a matter of law, Mazuma cannot recover the profit earned from its resale of the Mazuma Shares that was ultimately disgorged by the SEC.  For the foregoing reasons, it is hereby

**ORDERED**, that the Answering Defendants' motion for judgment on the pleadings is denied.

Dated: Central Islip, New York
May 19, 2014

_____*Arthur D. Spatt*
ARTHUR D. SPATT
United States District Judge